## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

LOUISE PATON,
and all those similarly situated,
    Plaintiffs,

    v.

STATE OF MICHIGAN,
RACHAEL EUBANKS, in her
personal capacity, and
TERRY STANTON, in his
personal capacity
    Defendants

_____/

Case No.: 26-cv-10389
Honorable _____

**COMPLAINT**
**JURY DEMANDED**

**\*\* CLASS ACTION\*\***

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Counsel for Plaintiff / Prop. Class
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

GRONDA PLC
MATTHEW E. GRONDA (P73693)
Counsel for Plaintiff / Prop. Class
4800 Fashion Sq Blvd, Ste 200
Saginaw, MI 48604
(989) 233-1639
matt@matthewgronda.com

### CLASS ACTION COMPLAINT

NOW COMES Plaintiff LOUISE PATON, both individually and as class representative, by and through counsel, and pleads unto this Court as follows:

### PARTIES

1.    Plaintiff LOUISE PATON is named directly and as proposed class representative.

2.    Defendant STATE OF MICHIGAN is a named party as a state sovereign.

1

3.     Defendant RACHAEL EUBANKS is administrator of the Unclaimed Property Program (UPP); she is sued in her personal capacity only.

4.     Defendant TERRY STANTON is state administrative manager of the Unclaimed Property Program (UPP); he is sued in his personal capacity only.

## JURISDICTION

5.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking relief against Defendants for past violations the United States Constitution.

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions and 28 U.S.C. § 1343, which authorizes federal courts to hear civil rights cases.

## GENERAL ALLEGATIONS

7.     Any non-real property asset, tangible or intangible, belonging to a person that remains inactive for an arbitrary-selected period of time is considered under Michigan law to be "unclaimed property."

8.     Unclaimed property consists of non-real estate assets such as checking and savings accounts, unpaid wages, securities, life insurance payouts, uncashed checks, unredeemed rebates, and the contents of safe deposit boxes that are without activity for a certain specified period of time.

9.     After that period of time, a "holder" (usually a business or other type of organization in possession of property belonging to another) having "unclaimed property" is required to turn over such property assets to Defendant STATE OF MICHIGAN's Unclaimed Property Program (UPP) within the Department of Treasury.

10.     Defendant RACHAEL EUBANKS is the administrator of the UPP.

11.     Defendant TERRY STANTON is state administrative manager of the UPP.

12.     Once property is turned over to the UPP, "the state assumes custody and responsibility for the safekeeping of the property." MCL 567.241(1).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

13.    Government reports confirm that Defendant STATE OF MICHIGAN "*never* takes ownership" of the unclaimed property but merely "serves as a custodian for the owner or heir." **Exhibit A**.

14.    The US Court of Appeals for the Sixth Circuit has explained that individuals like Plaintiff and members of the Class "have a property right in" their "net interest."

15.    Unclaimed property has been collected by Defendant STATE OF MICHIGAN and handled by its administrator, Defendant RACHAEL EUBANKS, and its state administrative manager, Defendant TERRY STANTON.

16.    When unclaimed property arrives into the custody and responsibility of Defendants, the monetized versions of these assets are deposited into bank accounts, which are, on information and belief, generating substantial additional earnings in the form of interest.

17.    Defendants are legally required to store these funds within one of two governmental budget accounts (which is different than what bank account the funds are deposited into).

    a.    The first is a "trust fund" which must keep a balance of at least $100,000 to allow for the "prompt payment of claims allowed." This is commonly known in the Michigan budgeting process as the "Escheats Fund."

    b.    The remaining (and extremely larger) balance is to be stored and held within the "General Fund" of the State of Michigan. See MCL 567.244(1).

18.    No matter how these monies are booked for accounting purposes in the Escheats Fund or the General Fund, these monies are deposited into one or more bank account(s) at a financial institution which, on information and belief, is (or supposed to be) generating substantial additional earnings in the form of interest.

19.    The sums of generated interest are the property of the private citizens, not the government. See *O'Connor v. Eubanks*, 83 F.4th 1018 (6th Cir. 2023).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

20.     The unconstitutional taking at issue occurred at the moment Defendants returned the principal without the interest that had accrued, or should have accrued, while property was held in state custody.

21.     When closing claim and retaining the interest component, Defendants effected a final, completed taking without the payment of just compensation.

## ABOUT PLAINTIFF

22.     Plaintiff LOUISE PATON had three assets held (but not owned) by Defendants that were turned over from US Bank NA, Aspen Dental Management, and the City of Port Huron, totaling $640.99. Exhibit B.

23.     Plaintiff LOUISE PATON petitioned for the return of her property.

24.     Defendants returned the $640.99 but failed to pay the time-value of money generated or should have been generated (i.e. interest) during the period the assets where held in the UPP. See **Exhibit C** (noting interest as "$0.00").

## CLASS ALLEGATIONS

25.     This action is brought by Plaintiff LOUISE PATON individually and on behalf of all those similarly situated.

26.     Plaintiff LOUISE PATON proposes a class  of all persons or entities who have not been provided just compensation equal to the amount of the interest income earned (less any proper proportional custodial expenses) that been generated or should have been generated on their assets while in the custody of Michigan's Unclaimed Property Program.

27.     The number of injured individuals who have been injured is sufficiently numerous to make class action status the most practical method to secure redress for injuries sustained and class wide equitable relief.

28.     There are clear questions fact raised by the named Plaintiff LOUISE PATON's claim common to, and typical of, those raised by the Class each seeks to represent.

29.     There are clear questions of law raised by the named Plaintiff LOUISE PATON's claims common to, and typical of, those raised by the Class each seeks to represent.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

30.    The violations of law and resulting harms alleged by the named Plaintiff LOUISE PATON are typical of the legal violations and harms suffered by all class members.

31.    Plaintiff LOUISE PATON, as Class representative, will fairly and adequately protect the interests of the class members and will vigorously prosecute the suit on behalf of the Class; and is represented by sufficiently experienced counsel.

32.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice, preventing possible inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

33.    Defendants have acted, failed to act, and/or are continuing to act on grounds generally applicable to all members of the Class.

**COUNT I**
**FIFTH AMENDMENT TAKING – DIRECT ACTION (*FIRST ENGLISH*)**
**AGAINST DEFENDANT STATE OF MICHIGAN**

34.    The previous allegations are re-alleged word for word herein.

35.    Generated interest, as described above, is a property right belonging to Plaintiff LOUISE PATON and members of the Class. *O'Connor v. Eubanks*, 83 F.4th 1018 (6th Cir. 2023); *Hendershot v. Stanton*, 162 F.4th 625 (6th Cir. 2025).

36.    Defendant STATE OF MICHIGAN has taken Plaintiff LOUISE PATON's and the class members' constitutionally-protected property in the form of monies equal to earned income (i.e. interest) on the held property assets, less proportional custodial expenses (if applicable), and have appropriated and/or will appropriate property without the payment of just compensation in violation of Fifth Amendment to the United States Constitution.

37.    Defendants do not intend to pay or otherwise will immediately pay just compensation by or via any known procedures.

38.    Unconstitutional takings occur pursuant to Fifth Amendment occurs when Defendants take, seize and use the interest generated to

Plaintiff LOUISE PATON's and class members' assets while in the custody of the UPP.

39.     Plaintiff LOUISE PATON and class members have suffered damages as a result.

40.     Plaintiff LOUISE PATON expressly asserts that state sovereign immunity does not exist in favor of Defendant State of Michigan for claims for annual interest as sought directly under the Fifth Amendment to the United States Constitution. See *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 315 (1987).

41.     To the extent that this Court believes it is bound to hold otherwise by *DLX, Inc v Kentucky*[1] or any other circuit precedent, this claim is made to expressly preserve the issue for review by an en banc panel of the United States Court of Appeals for the Sixth Circuit and/or by the United States Supreme Court.

**COUNT II**
**42 U.S.C. § 1983 – FIFTH AMENDMENT**
**AGAINST DEFENDANTS EUBANKS AND STANTON**
**(INTEREST)**

42.     The previous allegations are re-alleged word for word herein.

43.     Defendant RACHAEL EUBANKS is a state actor when serving in her role as administrator of the UPP.

44.     Defendant TERRY STANTON is a state actor when serving in his role as state administrative manager of the UPP.

45.     Under the Fifth Amendment, government officials can take property (like money) for public use but conditions that action on first immediately paying "just compensation."

46.     Following *O'Connor*, it is clearly established law that when a taking occurs, Defendants RACHAEL EUBANKS and TERRY STANTON have a constitutional duty to ensure that "just compensation" is provided for as the Constitution protects from "forcing some people alone to bear public

---

[1] 381 F.3d 511 (6th Cir. 2004)

burdens which, in all fairness and justice, should be borne by the public as a whole."

47.    Since at least 1933, "the Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking [state] remedies that may be available to the property owner." See *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019) (citing *Jacobs v. United States*, 290 U.S. 13 (1933)).

48.    Since *O'Connor*, any reasonable official in the positions held by Defendants RACHAEL EUBANKS and TERRY STANTON would or should know that interest generated on principal sums held in the custody of the government is a form of property belonging to owner of the principal and not the government.

49.    So, when property (i.e. the interest generated on privately-owned sums held in the custody of the government) was taken, it was clearly established that there must, constitutionally, be the payment of just compensation.

50.    Defendants RACHAEL EUBANKS and TERRY STANTON have caused Plaintiff LOUISE PATON and members of the Class to be deprived of their rights under Fifth Amendment to the United States Constitution when, while administering the UPP, each refused and still refuses to require the government for which each serves to cause the payment of (and has otherwise improper administered an unconstitutional statute which refuses to provide) just compensation equal to the annual income generated on the time value of money, less proportional custodial expenses (if applicable) while assets belonging to Plaintiff LOUISE PATON and members of the class are in the custody and control of the UPP.

51.    By failing to effectuate just compensation under the Fifth Amendment as officials in charge of the UPP, Defendants RACHAEL EUBANKS and TERRY STANTON caused Plaintiff LOUISE PATON and members of the Class to be deprived of the right of just compensation as secured by the Fifth Amendment to the United States Constitution and is liable as to Plaintiff LOUISE PATON and class members so injured.

52.    Plaintiff LOUISE PATON and members of the Class have suffered damages as a result.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

53.     The actions and/or inactions of Defendants RACHAEL EUBANKS and TERRY STANTON was expressly designed to intentionally or wantonly cause harm to Plaintiff LOUISE PATON and the members of the Class due to the utter disregard of the constitutionally protected rights of all members of the Class.

## JURY DEMAND

54.     A jury is demanded for all triable issues.

## RELIEF REQUESTED

55.     WHEREFORE, Plaintiff LOUISE PATON and/or the Class Members respectfully request this Court to—

a.    Enter an order certifying this case as a class action;

b.    Award all forms of damages, directing under the Fifth Amendment, related to the failure of Defendant STATE OF MICHIGAN to provide just compensation for its violations of the Fifth Amendment to the United States Constitution;

c.    Award all forms of damages, including (but not limited to) punitive damages, pursuant to 42 U.S.C. § 1983, when Defendants RACHAEL EUBANKS and TERRY STANTON deprived Plaintiff LOUISE PATON and class members of their rights to just compensation under Fifth Amendment to the United States Constitution;

d.    Award statutory judgment interest on said damages;

e.    Award and/or determine reasonable attorney fees and litigation expenses pursuant to all applicable laws, rules, or statutes, including under Rule 23 and 42 U.S.C. § 1988; and

f.    Enter an order for all such other relief the court deems proper, equitable and required, see e.g. FRCP 54(c).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Date: February 3, 2026        RESPECTFULLY SUBMITTED:

GRONDA PLC        /s/ Philip L. Ellison
MATTHEW E. GRONDA (P73693)   OUTSIDE LEGAL COUNSEL PLC
4800 Fashion Sq Blvd, Ste 200    PHILIP L. ELLISON (P74117)
Saginaw, MI 48604       PO Box 107
(989) 233-1639        Hemlock, MI 48626
matt@matthewgronda.com    (989) 642-0055
             pellison@olcplc.com

*Attorneys for Plaintiff(s)*

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com



**EXHIBIT**

**A**

**OUTSIDE LEGAL COUNSEL PLC**
www.olcplc.com

# Office of the Auditor General
Performance Audit Report

# Unclaimed Property
## Department of Treasury

### May 2017

### State of Michigan Auditor General
### Doug A. Ringler, CPA, CIA

271-0130-16

The auditor general shall conduct post audits of financial transactions and accounts of the state and of all branches, departments, offices, boards, commissions, agencies, authorities and institutions of the state established by this constitution or by law, and performance post audits thereof.

*Article IV, Section 53 of the Michigan Constitution*



**Report Summary**

*Performance Audit*

*Unclaimed Property (UP)*

*Department of Treasury (Treasury)*

**Report Number:**
**271-0130-16**

**Released:**
**May 2017**

Michigan's UP program serves as the central depository for abandoned and unclaimed property. The State Treasurer acts as property custodian on the owner's behalf. Most property that is held, issued, or owing in the ordinary course of a holder's business and remains unclaimed by the owner for more than three years after it becomes payable or distributed is presumed abandoned. Every business or government agency holding unclaimed property belonging to someone whose last known address was in Michigan must report its holdings to Treasury. For fiscal year 2016, UP received 9,749 unclaimed property holding reports valued at $150.3 million and paid 40,069 claims totaling $89.7 million.

| Audit Objective | | | Conclusion |
|---|---|---|---|
| Objective #1: To assess the sufficiency of UP's efforts to validate the accuracy of claimant information prior to releasing abandoned property. | | | Sufficient |
| **Findings Related to This Audit Objective** | **Material Condition** | **Reportable Condition** | **Agency Preliminary Response** |
| None reported. | Not applicable. | | |

| Audit Objective | | | Conclusion |
|---|---|---|---|
| Objective #2: To assess the sufficiency of UP's efforts to monitor contractors that provide auditing and financial services. | | | Sufficient, with exceptions |
| **Findings Related to This Audit Objective** | **Material Condition** | **Reportable Condition** | **Agency Preliminary Response** |
| UP should obtain a Service Organization Controls (SOC) 2, type 2 report from its contractor who serves as the custodian of unclaimed securities transferred to the State. Obtaining the SOC report would provide UP management with independent assurance that the contractor was processing and accounting for unclaimed securities in accordance with contract requirements (Finding #1). | | X | Agrees |

**Obtain Audit Reports**

Online:  audgen.michigan.gov

Phone:  (517) 334-8050

Office of the Auditor General
201 N. Washington Square, Sixth Floor
Lansing, Michigan  48913

**Doug A. Ringler, CPA, CIA**
Auditor General

**Laura J. Hirst, CPA**
Deputy Auditor General



**Doug A. Ringler, CPA, CIA**
Auditor General

Office of the Auditor General

201 N. Washington Square, Sixth Floor • Lansing, Michigan 48913 • Phone: (517) 334-8050 • audgen.michigan.gov

May 17, 2017

Mr. Nick A. Khouri
State Treasurer
Richard H. Austin Building
Lansing, Michigan

Dear Mr. Khouri:

I am pleased to provide this performance audit report on Unclaimed Property, Department of Treasury.

We organize our findings and observations by audit objective. Your agency provided a preliminary response to the recommendation at the end of our fieldwork. The *Michigan Compiled Laws* and administrative procedures require an audited agency to develop a plan to comply with the recommendations and submit it within 60 days of the date above to the Office of Internal Audit Services, State Budget Office. Within 30 days of receipt, the Office of Internal Audit Services is required to review the plan and either accept the plan as final or contact the agency to take additional steps to finalize the plan.

We appreciate the courtesy and cooperation extended to us during this audit.

Sincerely,

Doug Ringler

Doug Ringler
Auditor General

## **TABLE OF CONTENTS**

### **UNCLAIMED PROPERTY**

|                                                                                                       | Page |
| ----------------------------------------------------------------------------------------------------- | ---- |
| Report Summary                                                                                        | 1    |
| Report Letter                                                                                         | 3    |
|                                                                                                       |      |
| Audit Objectives, Conclusions, Findings, and Observations                                             |      |
|   Validating the Accuracy of Claimant Information Prior to Releasing Abandoned Property      | 8    |
|   Monitoring Auditing and Financial Services Contracts                                       | 9    |
|   Findings:                                                                                  |      |
|     1.  Enhanced review of contractor activities needed to ensure that internal control functions as designed. | 10   |
|                                                                                                       |      |
| Supplemental Information                                                                               |      |
|   Exhibit #1 - Abandonment Periods for Select Accounts                                       | 12   |
|   Exhibit #2 - Unclaimed Property Activity                                                   | 13   |
| Agency Description                                                                                    | 14   |
| Audit Scope, Methodology, and Other Information                                                        | 15   |
| Glossary of Abbreviations and Terms                                                                   | 19   |

# AUDIT OBJECTIVES, CONCLUSIONS, FINDINGS, AND OBSERVATIONS

## VALIDATING THE ACCURACY OF CLAIMANT INFORMATION PRIOR TO RELEASING ABANDONED PROPERTY

**BACKGROUND**

Unclaimed Property (UP) receives property from businesses and governmental agencies that belongs to someone else, has been dormant for a specified period, and remains unclaimed. Examples of unclaimed property* include uncashed payroll checks, inactive stocks, dividends, checking and savings accounts, and certain physical property (such as safety deposit boxes and tangible property*).  The dormancy period for most property types is three years (see Exhibit #1).  The State never takes ownership of the property but serves as a custodian for the owner or heir.

UP's main objective is to reunite owners or heirs with their lost or forgotten property.  To claim property, the rightful owners or their heirs file an inquiry with UP and provide sufficient documentation as to their right to the unclaimed property. Documentation could include copies of a birth certificate, a driver's license, a social security card, employment records, a will, or a trust.  It is UP's responsibility to validate the accuracy of the information received.

**AUDIT OBJECTIVE**

To assess the sufficiency of UP's efforts to validate the accuracy of claimant information prior to releasing abandoned property.

**CONCLUSION**

Sufficient.

**FACTORS IMPACTING CONCLUSION**

- Each of the 59 claims reviewed was properly approved and paid to the rightful claimant.

- Each of the 20 reports reviewed from holders* of abandoned property was accurate as to the number of units and value.

- UP monitored property edit reports to ensure that changes to abandoned property holdings were supported and accurately recorded.

- All claims forwarded to addresses that received 5 or more claim payments during fiscal years 2015 and 2016 were properly approved and paid to the rightful claimant.

- All claim payments made to UP staff were properly approved and appropriate.

*See glossary at end of report for definition.*

## MONITORING AUDITING AND FINANCIAL SERVICES CONTRACTS

**BACKGROUND**

UP contracts with six entities to complete audits to help ensure that holders of unclaimed property forward the property to the State.  The contractors are to audit, identify, and deliver unclaimed property from holders that are subject to report such property.  The contractors must submit written monthly reports detailing the work accomplished during the reporting period and are reimbursed based on the value of the property remitted to the State.

UP also contracts for financial services specific to unclaimed intangible property*.  UP forwards this property to a contractor who serves as the custodian, accounts for securities and related dividends and interest, and aids in the liquidation or transfer of these securities.  The contractor is required to sell the unclaimed intangible property when directed by the Department of Treasury (Treasury).  In addition, the contractor must deposit dividends, interest, and other cash receipts from the held securities into a money market account and remit those funds monthly to Treasury.

**AUDIT OBJECTIVE**

To assess the sufficiency of UP's efforts to monitor contractors that provide auditing and financial services.

**CONCLUSION**

Sufficient, with exceptions.

**FACTORS IMPACTING CONCLUSION**

- Each compliance requirement we reviewed from the auditing and financial services contracts was monitored by UP staff.

- UP reviewed monthly reports submitted by auditing contractors to identify holders that did not submit abandoned property to the State on a timely basis.  UP pursued late fees and interest from applicable holders as allowed for by law.

- UP periodically ensured that the financial services contractor traded securities at market value.

- A reportable condition* exists related to UP not requiring the financial services contractor to obtain a Service Organization Controls (SOC) 2, type 2 report*.

*See glossary at end of report for definition.*

## FINDING #1

**Enhanced review of contractor activities needed to ensure that internal control functions as designed.**

The contractor transferred $83.7 million to UP between October 1, 2014 and September 30, 2016.

UP should obtain a SOC 2, type 2 report from its contractor who serves as the custodian of unclaimed securities transferred to the State. Obtaining the SOC 2 report would provide UP management with independent assurance that the contractor was processing and accounting for unclaimed securities in accordance with contract requirements.

UP contracted with a custodian to maintain and account for unclaimed securities transferred to the State. These securities consist of stocks, mutual funds, bonds, debentures, and associated dividends or interest. The contractor is also responsible for the liquidation or transfer of securities to unclaimed property owners at the direction of the State. Use of a contractor subjects UP to additional risks because the securities are accounted for using processes established by the contractor. To measure and mitigate these risks, UP needs information about the contractor's processes. Between October 1, 2014 and September 30, 2016, the contractor transferred $83.7 million to UP for proceeds from stock sales, dividends, cash-in-lieu of fractional shares, as well as cash distributions from stock mergers. During our audit period, UP's oversight of the contractor's internal control* was based on information provided by the contractor.

An effective method to assess internal control and risks associated with contracted services is to obtain an independent analysis of the design and operating effectiveness relevant to the processes that the contractor uses. This analysis, referred to as a SOC report, is completed by an independent certified public accountant. The analysis provides a validation of the contractor's description of the processes' internal control and reports on the suitability of the design and operating effectiveness of those processes. SOC 2, type 2 reports can address any combination of five predefined control principles: security, availability, processing integrity, confidentiality, and privacy.

UP's contract with the security custodian did not require the contractor to obtain a SOC 2 report, and UP did not request the contractor to have one completed.

**RECOMMENDATION**

We recommend that UP obtain a SOC 2, type 2 report from its contractor who serves as the custodian of unclaimed securities transferred to the State.

**AGENCY PRELIMINARY RESPONSE**

UP provided us with the following response:

*Treasury agrees with the recommendation. A policy did not exist at the time of contract execution requiring that a SOC 2, type 2 report be provided by the vendor annually. As noted in the Office of the Auditor General report, UP's contract with the*

---

*\* See glossary at end of report for definition.*

*security custodian did not require the contractor to obtain a SOC 2 report and UP did not request the contractor to have one completed.*

*Treasury does support the recommendation that a SOC 2, type 2 report be provided if the result of a risk assessment determines a SOC 2, type 2 is necessary.  If a SOC 2, type 2 is necessary, Treasury will issue a Statement of Work (SOW) to the vendor requesting the vendor provide a proposal for providing the required SOC report.  Upon receipt of the vendor proposal, Treasury will, in conjunction with Department of Technology, Management, and Budget Procurement, conduct a risk/benefit analysis based on the cost of the SOW and will secure funding for the work if the analysis indicates a SOC 2 report is warranted.*

*During the audit, as a result of a request from UP, the contractor provided a SOC 1, type 2 which indicated the contractor's financial and security internal controls are effective.*

.

**SUPPLEMENTAL INFORMATION**

UNAUDITED
Exhibit #1

UNCLAIMED PROPERTY
Department of Treasury

Abandonment Periods for Select Accounts
For Fiscal Years 2015 and 2016

| Typical Holder | Type of Asset | Abandonment Date |
|---|---|---|
| Financial organization | Check, cashier's check, or certified check | 3 years after it was payable |
| Financial organization | Savings account, checking account, or time deposit | 3 years after last deposit/withdraw |
| Financial organization | Certificates of deposit | 3 years from maturity date or, if automatically renewable, 15 years since first renewal |
| Financial organization | Mutual fund shares | 3 years after last owner-initiated contact |
| Financial organization | Safe deposit box contents | 3 years after the rental period expires |
| Financial organization | Christmas club funds | 3 years from last deposit |
| Financial organization | Loan collateral | 3 years after the loan was paid in full |
| Insurance company | Life insurance benefit or endowment payment | 3 years after funds became due |
| Insurance company | Premium refund | 3 years after the date the credit occurred |
| Business | Gift cards | 3 years after becoming payable or 3 years of inactivity |
| Business | Commissions on sales | 1 year after payment date |
| Business | Dividend payment | 3 years after payable date |
| Business | Shares of stock | 3 years after last owner-initiated contact |
| Business | Utility deposits | 1 year after termination of service |
| Business/Governmental unit | Customer overpayment | 3 years from payment date |
| Business/Governmental unit | Unpaid wages | 1 year after becoming payable |
| Business/Governmental unit | Health saving accounts | 3 years from last transaction |
| Governmental unit | Municipal bond principal and interest | 1 year from maturity date |
| Governmental unit | United States government securities | 1 year from payment |
| Title company | Escrow accounts | 3 years |
| Court order | Child support payments | 1 year after payment was made |

Sources: *Michigan Compiled Laws* and Department of Treasury Manual for Reporting Unclaimed Property.

UNAUDITED
Exhibit #2

UNCLAIMED PROPERTY
Department of Treasury

Unclaimed Property Activity
For Fiscal Year 2016

| | Claims Issued | Percent of Claims Issued | Claim Payments Issued | Percent of Claim Payments Issued | Number of Holders Reporting | Percent of Holders Reporting | Cash Holdings Received[1] | Percent of Cash Holdings |
|---|---|---|---|---|---|---|---|---|
| $0.00 | 152 | 0.38% | $ 0 | 0.00% | 407 | 4.17% | $ 0 | 0.00% |
| $.01 to $10.00 | 1,458 | 3.64% | 7,584 | 0.01% | 917 | 9.41% | 3,477 | 0.00% |
| $10.01 to $100.00 | 10,559 | 26.35% | 597,696 | 0.67% | 2,010 | 20.62% | 92,699 | 0.06% |
| $100.01 to $250.00 | 8,177 | 20.41% | 1,321,814 | 1.47% | 1,251 | 12.83% | 209,852 | 0.14% |
| $250.01 to $500.00 | 5,755 | 14.36% | 2,061,544 | 2.30% | 975 | 10.00% | 349,557 | 0.23% |
| $500.01 to $1,000.00 | 4,497 | 11.22% | 3,182,479 | 3.55% | 867 | 8.89% | 627,363 | 0.42% |
| $1,000.01 to $2,500.00 | 4,248 | 10.60% | 6,806,135 | 7.59% | 1,107 | 11.36% | 1,782,374 | 1.19% |
| $2,500.01 to $5,000.00 | 2,234 | 5.57% | 7,847,941 | 8.75% | 645 | 6.62% | 2,299,615 | 1.53% |
| $5,000.01 to $10,000.00 | 1,549 | 3.87% | 10,847,682 | 12.09% | 520 | 5.33% | 3,679,473 | 2.45% |
| $10,000.01 to $50,000.00 | 1,201 | 3.00% | 24,761,732 | 27.61% | 657 | 6.74% | 14,489,674 | 9.64% |
| $50,000.01 to $100,000.00 | 148 | 0.37% | 10,015,202 | 11.17% | 161 | 1.65% | 11,508,365 | 7.66% |
| $100,000.01 to $1,000,000.00 | 88 | 0.22% | 18,140,120 | 20.22% | 209 | 2.14% | 58,956,189 | 39.24% |
| > $1,000,000.01 | 3 | 0.01% | 4,103,683 | 4.57% | 23 | 0.24% | 56,258,136 | 37.44% |
| Totals | 40,069 | 100.00% | $89,693,613 | 100.00% | 9,749 | 100.00% | $150,256,772 | 100.00% |

[1]Holdings reported with $0 may have been related to securities or contents of unclaimed safe deposit boxes.  Subsequent to the receipt of these types of holdings, the custodian of securities attempts to sell at market value.  In addition, Treasury follows its procedures to value contents of safe deposit boxes.

Number of shares deposited with the contractor who was the custodian of securities for the State in fiscal year 2016:  17,236,837

Amount of security sales, dividends, cash-in-lieu of fractional shares, and distributions from stock mergers forwarded to the State during fiscal year 2016 from the contractor who was the custodian of securities:

| Transfer Date | Amounts Forwarded to Unclaimed Property |
|---|---|
| 11/01/2015 | $ 638,913 |
| 12/01/2015 | 144,214 |
| 01/01/2016 | 1,098,936 |
| 02/01/2016 | 499,081 |
| 03/01/2016 | 89,305 |
| 04/01/2016 | 40,532 |
| 05/01/2016 | 42,692 |
| 06/01/2016 | 6,368,941 |
| 07/01/2016 | 752,055 |
| 08/01/2016 | 5,459,334 |
| 09/01/2016 | 12,695,315 |
| 09/01/2016 | 526,791 |
| | $28,356,109 |

Source: The Office of the Auditor General prepared this exhibit based on information provided by UP.

# AGENCY DESCRIPTION

Michigan's UP program is governed by the Michigan Uniform Unclaimed Property Act (Public Act 29 of 1995, as amended). The program is administered by Treasury and it serves as the State of Michigan's central depository for abandoned and unclaimed property. The State Treasurer is the administrator of the Uniform Unclaimed Property Act and acts as custodian of the property on behalf of the owner.

Most property, including any income or increment derived from the property, that is held, issued, or owing in the ordinary course of a holder's business and remains unclaimed by the owner for more than three years after it becomes payable or distributed is presumed abandoned (see Exhibit #1). Every business or government agency holding unclaimed property belonging to someone whose last known address was in Michigan must report its holdings to Treasury. Reports of unclaimed property are due each year by July 1 for property reaching its dormancy period as of March 31. An entity who fails to deliver unclaimed property within the time prescribed shall pay interest on the property or value of the property from the date the property should have been delivered and be subject to a civil penalty of $100 per day.

UP's goal is to post all unclaimed property on its Web site within 90 days of receiving the property. UP's primary objective is to match claims to owners. To process a claim, UP matches proof provided by the claimant to information and property descriptions provided by the holder. The number of approvals needed to process a claim varies from 2 to 5 depending on the value of the unclaimed property.

For fiscal year 2016, UP incurred expenditures of $6.0 million. As of September 30, 2016, UP had 26 full-time employees. For fiscal year 2016, UP received 9,749 unclaimed property holding reports valued at $150.3 million and paid 40,069 claims totaling $89.7 million (see Exhibit #2).

## AUDIT SCOPE, METHODOLOGY, AND OTHER INFORMATION

**AUDIT SCOPE**

To examine the program and other records related to UP.  We conducted this performance audit* in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our finding and conclusions based on audit objectives.  We believe that the evidence obtained provides a reasonable basis for our finding and conclusions based on our audit objectives.

**PERIOD**

Our audit procedures, which included a preliminary survey, audit fieldwork, report preparation, analysis of agency response, and quality assurance, generally covered October 1, 2014 through September 30, 2016.

**METHODOLOGY**

We conducted a preliminary survey of UP to formulate a basis for establishing our audit objectives and defining our audit scope and methodology.  We:

- Interviewed UP staff to obtain an understanding of processing holdings, verifying claim payments, and using contractors for auditing and financial services.

- Reviewed applicable laws, policies and procedures, and other relevant information provided by UP.

- Reviewed Treasury's evaluation of internal control for claims processing and holder reports and receipts.

- Completed limited testing of claims paid to verify UP's process for identifying owners of unclaimed property.

- Reviewed tangible property maintained in the secured custody room and observed the processing of mail directed to UP.

- Reviewed the process to sell unclaimed tangible property at a State-sponsored auction.

**OBJECTIVE #1**

To assess the sufficiency of UP's efforts to validate the accuracy of claimant information prior to releasing abandoned property.

To accomplish this objective, we:

- Identified the population of claims that UP paid during fiscal years 2015 and 2016.

*See glossary at end of report for definition.*

- Reviewed a random sample of 59 claims to determine if claims paid were accurate, paid to the rightful claimant, appropriately approved, and adequately documented. Our sample was randomly selected to eliminate any bias and to enable us to project the results to the entire population.

- Ensured that payments to UP employees were appropriately supported and properly approved.

- Reviewed claim payments made to addresses that received 5 or more claim payments from October 1, 2014 through September 30, 2016 to ensure that these claims were properly approved and paid to the rightful claimant.

- Analyzed the claim payment population for fiscal years 2015 and 2016 by the initial approver for any unusual items.

- Verified that UP supervisory staff reviewed weekly property edit reports for the months of May 2016 and June 2016 to ensure that property edits were appropriate and supported.

- Identified the population of holders that reported abandoned unclaimed property to Treasury during fiscal years 2015 and 2016.

- Reviewed a random sample of 15 holder reports involving 677 intangible properties received during fiscal years 2015 and 2016 to ensure that intangible unclaimed property was dormant for the required period of time, processed in a timely manner, and appropriately posted to the UP Web site.  Our sample results cannot be projected to all fiscal year 2015 and 2016 holdings because Treasury processed additional holder reports for this period after our sample selection.

- Reviewed a judgmental sample of 5 holder reports involving 15 properties received during 2015 to ensure that tangible property was dormant for the required period of time, processed in a timely manner, and appropriately posted to the UP Web site.  We judgmentally selected the 5 holder reports based on the number of items reported and the nature of the holder's business.  Therefore, we could not project the results to the entire population.

- Verified for a random sample of 5 employees that access to the UP information technology system was consistent with the employees' job descriptions.

- Verified that all employees of UP received training in fiscal year 2016 related to the confidentiality of information.

**OBJECTIVE #2**　　　　To assess the sufficiency of UP's efforts to monitor contractors that provide auditing and financial services.

To accomplish this objective, we:

- Reviewed the contracts for auditing and financial services to identify compliance requirements that should be monitored by Treasury.

- Met with UP staff to discuss their efforts to monitor contractor activities and contract compliance requirements.

- Reviewed the February 2016 monthly status reports from the auditing contractors to determine if UP pursued holdings and related fees and interest payments from entities identified by the auditors as not reporting abandoned property on a timely basis.

- Reviewed revenue amounts received during fiscal years 2015 and 2016 from the financial services contractor for the sale of securities, dividend payments, cash-in-lieu of fractional shares of stock, and distributions from stock mergers.

- Reviewed the process that UP utilizes to reconcile proceeds from the sale of securities by the financial services contractor.

- Reviewed the unit price received by the financial services contractor for 50 securities traded during May 2015 or May 2016 to ensure that the contractor obtained market value for the traded units.  We judgmentally selected the 50 securities based on various criteria, including the number of units traded and price per unit. Therefore, we could not project the results to the entire population.

- Determined if the financial services contractor provided a SOC 2, type 2 report to UP that assesses the contractor's internal control.

**CONCLUSIONS**　　　　We base our conclusions on our audit efforts and any resulting material conditions* or reportable conditions.

When selecting activities or programs for audit, we direct our efforts based on risk and opportunities to improve State government operations.  Consequently, we prepare our performance audit reports on an exception basis.

*See glossary at end of report for definition.*

**AGENCY RESPONSES**

Our audit report contains 1 finding and 1 corresponding recommendation.  Treasury's preliminary response indicates that it agrees with the recommendation.

The agency preliminary response that follows the recommendation in our report was taken from the agency's written comments and oral discussion at the end of our audit fieldwork.  Section 18.1462 of the *Michigan Compiled Laws* and the State of Michigan Financial Management Guide (Part VII, Chapter 4, Section 100) require an audited agency to develop a plan to comply with the recommendations and submit it within 60 days after release of the audit report to the Office of Internal Audit Services, State Budget Office.  Within 30 days of receipt, the Office of Internal Audit Services is required to review the plan and either accept the plan as final or contact the agency to take additional steps to finalize the plan.

**SUPPLEMENTAL INFORMATION**

Our audit report includes supplemental information presented as Exhibits #1 and #2.  Our audit was not directed toward expressing a conclusion on this information.

# GLOSSARY OF ABBREVIATIONS AND TERMS

**holder**
A person, wherever organized or domiciled, who is in possession of property belonging to another individual or a trustee or who is indebted to another as part of an obligation.

**intangible property**
Includes all of the following:  money, checks, drafts, deposits, interest dividends, and income; credit balances, customer overpayment, gift certificates, security deposits, refunds, credit memos, unpaid wages, unused airline tickets, and unidentified remittances; stocks and other intangible ownership interest in business associations; money deposited to redeem stocks, bonds, coupons, and other securities or to make distributions; amounts due and payable under the terms of insurance policies; and amounts distributable from a trust or custodial fund established under a plan to provide health, welfare, pension, vacation, severance, retirement, death, stock purchase, profit sharing, employee savings, supplemental unemployment insurance, or similar benefits.

**internal control**
The plan, policies, methods, and procedures adopted by management to meet its mission, goals, and objectives.  Internal control includes the processes for planning, organizing, directing, and controlling program operations.  It also includes the systems for measuring, reporting, and monitoring program performance. Internal control serves as a defense in safeguarding assets and in preventing and detecting errors; fraud; violations of laws, regulations, and provisions of contracts and grant agreements; or abuse.

**material condition**
A matter that, in the auditor's judgment, is more severe than a reportable condition and could impair the ability of management to operate a program in an effective and efficient manner and/or could adversely affect the judgment of an interested person concerning the effectiveness and efficiency of the program.

**performance audit**
An audit that provides findings or conclusions based on an evaluation of sufficient, appropriate evidence against criteria. Performance audits provide objective analysis to assist management and those charged with governance and oversight in using the information to improve program performance and operations, reduce costs, facilitate decision making by parties with responsibility to oversee or initiate corrective action, and contribute to public accountability.

**reportable condition**
A matter that, in the auditor's judgment, is less severe than a material condition and falls within any of the following categories: an opportunity for improvement within the context of the audit objectives; a deficiency in internal control that is significant within the context of the audit objectives; all instances of fraud; illegal acts unless they are inconsequential within the context of the audit objectives; significant violations of provisions of contracts or grant agreements; and significant abuse that has occurred or is likely to have occurred.

| | |
|---|---|
| **Service Organization Controls (SOC) report** | Designed to help organizations that provide services to user entities build trust and confidence in their delivery processes and controls through a report by an independent certified public accountant (CPA).  Each type of SOC report is designed to help service organizations meet specific user needs: |

- SOC 1 (Report on Controls at a Service Organization Relevant to User Entities' Internal Control Over Financial Reporting) - Intended for user entities and the CPAs auditing their financial statements in evaluating the effect of the service organization's controls on the user entities' financial statements.

- SOC 2 (Report on Controls at a Service Organization Relevant to Security, Availability, Processing Integrity, Confidentiality, or Privacy) - Intended for a broad range of users that need information and assurance about a service organization's controls relevant to any combination of the five predefined control principles.

  There are two types of SOC 1 and SOC 2 reports:

  - Type 1 - Reports on the fairness of the service organization's description of controls and the suitability of the design of the controls to achieve the related control objectives included in the description, as of a specified date.

  - Type 2 - Includes the information in a type 1 report and also addresses the operating effectiveness of the controls to achieve the related control objectives included in the description, throughout a specified period.

- SOC 3 (Trust Services Report for a Service Organization) - Intended for those needing assurance about a service organization's controls that affect the security, availability, or processing integrity of the systems a service organization employs to process user entities' information, or the confidentiality or privacy of that information, but do not have the need for or the knowledge necessary to make effective use of a SOC 2 report.

| | |
|---|---|
| **tangible property** | Includes items in safe deposit boxes, personal property, or personal effects. |
| **Treasury** | Department of Treasury. |
| **unclaimed property** | Tangible or intangible property that is unclaimed by its rightful owner. |
| **UP** | Unclaimed Property. |



**Report Fraud/Waste/Abuse**

Online:  audgen.michigan.gov/report-fraud
Hotline:  (517) 334-8060, Ext. 1650

5634 (REV.11-24)





Claim ID: 4619788

State of Michigan
**DEPARTMENT OF TREASURY**
LANSING

GRETCHEN WHITMER
GOVERNOR

RACHAEL EUBANKS
STATE TREASURER

**LOUISE PATON**

November 07, 2025

**Please allow up to 90 days for your information to be reviewed.**

### A. Claimant Information

Current Legal Name if different than above:

Current Mailing Address if different than above:

| Claimant SSN / EIN | Owner SSN / EIN | Daytime Phone | Email Address |
|---|---|---|---|

### B. Documentation Required - All documents must be LEGIBLE copies. If they are not LEGIBLE, you will be required to provide clear copies.

- **Photo ID** — Provide a copy of your valid driver's license(s) or state-issued identification card(s).
- **Social Security Card** — Provide a copy of your social security card(s). Alternatively, you may provide a government-issued document verifying your complete social security number. All nine digits must be visible.
- **Signature(s)** — Provide your signature(s) on the claim form.
- **Addresses & Names** — Provide a written list of ALL historical addresses used by the property owner(s), including PO boxes. Include as many as you can recall. If applicable, include any other names used by the property owner(s) (maiden, married, legal name change, business merger).

### C. Property Information

| Owner | Company/Security Name | Type of Property | Property ID | Reported Date | Value |
|---|---|---|---|---|---|
| PATON LOUISE | U S BANK NA | AC01: CHECKING ACCOUNTS | 19383672 | 06/27/2016 | Cash: $ 477.04 |
| LOUISE PATON | ASPEN DENTAL MANAGEMENT INC | MS09: CREDIT BAL - ACCTS RECEIVABLE | 21765847 | 06/07/2018 | Cash: $ 15.80 |
| LOUISE PATON | PORT HURON CITY OF | MS11: REFUNDS DUE | 21836739 | 06/20/2018 | Cash: $ 148.15 |
| Grand Total of Property | | | | Est. Cash: | $640.99 |

### D. Tangible Information

No Tangible Property Claimed



## STATE OF MICHIGAN
### REMITTANCE ADVICE

EXHIBIT

**C**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

BANK ID:   **000**
VENDOR NO:   **MISC00001**   AGENCY UNIT:   **X28L STEP ESCHEATS SYSTEM**

| INVOICE NUMBER | INVOICE DATE | REFERENCE DOCUMENT | AMOUNT |
|---|---|---|---|
| | GAX9N   271   U26011600251 | | $640.99 |
| U26011600251 | | | |
| Unclaimed Property Refund: 640.99 Interest: 0.00 Claim Number: | | | |
| 4619786 Payee: LOUISE PATON | | | $640.99 |
| Total Payment Amount | | | |
| | | | $640.99 |
| Net Payment Amount | | | |

| Check Total | | |
|---|---|---|
| | | $640.99 |

MICHIGAN DEPARTMENT OF TREASURY UNCLAIMED PROPERTY - CLAIMS REPRESENTATIVE
PO BOX 30788 LANSING, MI 48909
PHONE 517-636-5320

W-1001 (Rev. 09-17)

**DETACH HERE - RETAIN STUB FOR YOUR RECORDS - DETACH HERE**

---

GRETCHEN WHITMER, GOVERNOR          000      109361395

## STATE OF MICHIGAN

MISC00001     X28L
VENDOR NO.     AGENCY                                    01/21/2026     56-1544 / 441

SIX HUNDRED FORTY AND 99/100 DOLLARS                                    $640.99

000450

PAY TO THE     LOUISE PATON
ORDER OF

Security features included.
Details on back.

JPMorgan Chase Bank, N.A.
Columbus, OH

RACHAEL EUBANKS, STATE TREASURER

REVERSE IMAGE OF NUMBER PRINTED ON BACK MUST APPEAR HERE

THE TWO-COLOR AREA OF THIS DOCUMENT CHANGES TONE GRADUALLY FROM DARK TO LIGHT